U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 DEC 15  PM 12: 22

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| LEVEL 3 COMMUNICATIONS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 5:11-cv-280 |
| | ) |
| TELEPHONE OPERATING COMPANY | ) |
| OF VERMONT, LLC, NORTHERN | ) |
| NEW ENGLAND TELEPHONE | ) |
| OPERATIONS, LLC, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
(Doc. 2)

This matter came before the court for an evidentiary hearing on November 28, December 1, and December 6, 2011 on the motion for a temporary restraining order and preliminary injunction filed by Plaintiff Level 3 Communications, LLC ("Level 3") (Doc. 2). Level 3 asks the court to enjoin Defendants Telephone Operating Company of Vermont, LLC and Northern New England Telephone Operations, LLC (collectively, "FairPoint") from refusing to fill Level 3's orders under a tariff FairPoint filed with the Federal Communications Commission (the "FCC"). FairPoint opposes the motion.   The parties completed their post-hearing briefing on December 12, 2011.

Level 3 is represented by Eric J. Branfman, Esq. and Karen L. Tyler, Esq. FairPoint is represented by R. Jeffrey Behm, Esq. and Peter H. Zamore, Esq.

## I. PROCEDURAL BACKGROUND.

On October 24, 2011, FairPoint filed a collection action against Level 3 in the District of New Hampshire, alleging that Level 3 had failed to pay amounts due under the

parties' Interconnection Agreement.  The New Hampshire action involves the same parties and the same disputed charges that are at issue in this lawsuit.  Level 3 has moved to dismiss that lawsuit for lack of subject matter jurisdiction, alleging there is no diversity of citizenship.  Fairpoint has opposed that motion, contending there is federal question jurisdiction.

On November 21, 2011, Level 3 filed the instant lawsuit.  In its three count Complaint, Level 3 seeks declaratory and injunctive relief and damages against FairPoint. In count one, Level 3 alleges that FairPoint has engaged in an unjust and unreasonable practice in violation of 47 U.S.C. § 201(b) of the Communications Act of 1934 (the "Telecommunications Act").  In count two, Level 3 alleges that FairPoint violated FCC Tariff No. 1 (the "Tariff").  In count three, Level 3 seeks declaratory and injunctive relief under the federal Declaratory Judgments Act, 28 U.S.C. §§ 2201 *et seq.*, for violations of the Tariff.

FairPoint has file a motion to dismiss the instant lawsuit as duplicative, arguing the parties must proceed in New Hampshire pursuant to the "first filed" doctrine.  Level 3 opposed that motion on December 12, 2011.  As the deadline for FairPoint's reply has not yet expired, the motion is not ripe for adjudication.

## II.  FINDINGS OF FACT.

For the purposes of the pending motion, based upon the admissible evidence, the court makes the following findings of fact:

**The Parties**

1. Level 3 is a national and international telecommunications service provider that offers voice, Internet, video, and data services to its customers.  It is authorized to provide long distance services, also known as "interexchange services" throughout the United States.

2. In Vermont, New Hampshire, and Maine ("Northern New England"), Level 3 is certified by the respective state utility commissions to serve as a competitive local exchange carrier and is authorized to provide local telephone services to customers in those states.  In Northern New England, Level 3's business is focused on "business to business" voice, video, and Internet services.  It also serves as the "last

mile" connection meaning it provides the connection into the end user's billing address. In Vermont, Level 3 provides "last mile" services to approximately 300 buildings. In New Hampshire, it provides "last mile" services to between two and four buildings. In Maine, it provides no "last mile" services.

3. In Northern New England, FairPoint is the incumbent local telephone company meaning that it owns the majority of the network once owned by the monopoly telecommunications provider that formally operated in the area. Accordingly, FairPoint has the majority of, and sometimes the only, connections to customers in Northern New England. Given the rural character of certain portions of Northern New England, it is often cost prohibitive for other telecommunications providers to provide "last mile" services to every customer. To address this need, FairPoint makes its last-mile facilities available on a non-discriminatory wholesale basis to other carriers through its Tariff. Customers who choose to accept the services offered in FairPoint's Tariff generally enter into an Interconnection Agreement with FairPoint which must be approved by the relevant regulatory authorities.

4. In Northern New England, Level 3 purchases switched access and special access services (including "last mile" services) from FairPoint. The parties have entered into an approved Interconnection Agreement.

5. Since approximately November of 2010, the parties have had a number of disputes regarding charges allegedly due and owing from Level 3 to FairPoint under the Tariff, the Interconnection Agreement, and state tariffs. FairPoint alleges that the amount now due from Level 3 is approximately $7.9 million. As of October 28, 2011, FairPoint has refused to fill any orders for new circuits submitted by Level 3 because of Level 3's alleged nonpayment of past invoices.

**The Provisions of the Tariff**

6. Section 2.1.8 of FairPoint's Tariff permits FairPoint to refuse to provide new services and to discontinue existing services to Level 3 under certain circumstances, including the failure to pay for services at the time and in the manner specified in the Tariff which is generally within thirty-one days of the bill date. In the circumstances present here, the Tariff requires FairPoint to give Level 3 thirty days' notice before an embargo may take effect. Pursuant to Section 2.1.8(F) of the Tariff, FairPoint may not declare an embargo with regard to "charges that a customer does not pay based on submission of a good faith dispute pursuant to 2.4.1(B)(3) [of the Tariff]."

7. The parties dispute whether Level 3 has submitted a good faith dispute under the Tariff. Section 2.4.1 of the Tariff addresses payment of rates, charges and deposits. Subsection 2.4.1(B)(3)(c) defines a "good faith dispute" as follows:

> A good faith dispute requires the customer to provide a written claim to the Telephone Company. Instructions for submitting a dispute can be obtained by calling the billing inquiry number shown on the customer's bill, or, by accessing the Telephone Company's website shown on the customer's bill. Such claim must identify in detail the basis for the dispute, and if the customer withholds disputed amounts, it must identify the account number under which the bill has been rendered, the date of the bill and the specific items on the bill being disputed, to permit the Telephone Company to investigate the merits of the dispute.

8. According to Section 2.4.1(B)(3)(c) of the Tariff, "[t]he date of resolution" of a good faith dispute is the date on which "the Telephone Company completes its investigation of the dispute, notifies the customer of the disposition and, [if] the billing dispute is resolved in favor of the customer," applies the appropriate credits.

9. If the billing dispute is resolved in favor of FairPoint, any payments withheld pending resolution of the dispute must be paid and are subject to a late payment penalty. In such circumstances, the customer will not receive a disputed amount penalty credit and/or a late payment penalty credit.

**The Resolution Process**

10. In approximately November of 2010, FairPoint noticed that Level 3 was disputing a number of charges by stating that "the dispute is for usage billed that does not reflect the proper PIU \ PLU [percent interstate use\percent local use] factors of the traffic." By e-mail dated March 9, 2011, FairPoint notified Level 3 that its description of the reason for the dispute was not sufficiently detailed to allow FairPoint to research and resolve the usage claims. Level 3 did not immediately respond to this request for information.

11. By letter dated May 11, 2011, FairPoint notified Level 3 that its past due balance at that time was approximately $3.5 million. FairPoint demanded payment and further demanded financial assurance through the provision of an irrevocable Letter of Credit in the amount of one million dollars. In seeking this assurance, FairPoint relies on that provision of the Tariff which "requires only a customer which has a proven history of late payments to the Telephone Company or does not have established credit to make a deposit, prior to or at any time after the provision of a

4

service to the customer" to be held by FairPoint "as a guarantee of the payment of rates and charges." Tariff 2.4.1(A).

12. In the May 11th letter, FairPoint further advised Level 3 that pursuant to Section 2.1.8(C) of the Tariff, FairPoint may declare an embargo and, if it did so, it would not process Level 3's new service orders and would suspend any existing in process service orders if the past due amounts remained unpaid. It advised that it would treat any failure by Level 3 to provide the required financial assurance of payment as a default.

13. In response to the May 11th letter, Level 3 did not provide a Letter of Credit or pay the amounts allegedly due.

14. On May 23, 2011, Level 3 responded to FairPoint's March 9, 2011 e-mail requesting additional information and apologized for its delay in providing a response. Level 3 noted its "dispute methodology" was based upon estimated rather than actual minutes of use and that because the issue was "somewhat complex," Level 3 asked to set up a conference with FairPoint for further discussion. Thereafter, the parties engaged in several months of discussions about the disputed charges. During this time period, Level 3 continued to dispute additional charges on new invoices.

15. The biggest area of dispute between the parties concerns VoIP Traffic charges which the parties agree constitutes approximately 50% of the $7.9 million in question.

16. Pursuant to a Unitary Rate Amendment ("URA") to the parties' Interconnection Agreement, Level 3 is responsible for tracking all "VoIP Traffic" that originates or terminates on the Public Switched Telephone Network ("PSTN"). Under the URA, "VoIP Traffic" means all voice communications that are transmitted in whole or in part over packet switching facilities using Internet Protocol or any similar packet protocol. VoIP Traffic is entitled to different rates based upon its point of origination and termination. VoIP Traffic that originates on and terminates to the PSTN is subject to charges pursuant to the AT&T Order referenced in the URA. The parties agreed that other types of VoIP Traffic which may originate or terminate on the PSTN would be subject to inter-carrier compensation rates until the FCC issues a substantive order. With regard to traffic Level 3 delivers to FairPoint that originates with a third party carrier, Level 3 is required to pay FairPoint the same rates as would have been paid by the third party carrier.

17. The URA imposes specific duties upon Level 3 with regard to tracking VoIP Traffic in recognition that Level 3 is often the only party that can provide this information.

Under the URA, Level 3 is required to identify and track all VoIP Traffic that either originates or terminates on the PSTN through the use of a Call Record which includes identification of any VoIP Traffic as VoIP Traffic, as well as least one of the following: charge number, Calling Party Number or Automatic Number Identifier. In tracking VoIP Traffic and all other calls, Level 3 is required to create and maintain a Call Record in its original, unaltered form. Neither party may remove, alter, replace, insert, or add information to a Call Record.

18. By letter dated August 19, 2011, FairPoint advised Level 3 that the amount due was in excess of $4.5 million. It pointed out that Level 3 was responsible for tracking VoIP Traffic and because it could not provide original, unaltered records regarding VoIP Traffic, it could not rely on this as a basis for a good faith dispute. In any event, FairPoint contended that Level 3 had not even paid the applicable inter-carrier compensation rates under the URA for VoIP Traffic. FairPoint further pointed out that Level 3 had not provided the requested Letter of Credit. FairPoint advised that if the amounts past due were not paid, FairPoint would declare an embargo and would cease providing services under existing agreements and would no longer fill new orders. It demanded unaltered Call Records within ten days.

19. By e-mail dated August 19, 2011, Level 3 advised that it did not actually track VoIP Traffic but, rather, determined what was VoIP Traffic based upon percentages:

> VoIP vs Non-VoIP Traffic—In working with other vendors, this has historically been the key item that people are trying to understand. Unfortunately, you will not get this directly from the CDR [Call Detail Record] as we don't include this distinguishment in the call records. We have an offline dispute process in which we analyze the traffic by customer type and apply a percentage prior to disputing. We can certainly provide these percentages as we have done for many other vendors and that could potentially help you guys avoid detail CDR [Call Detail Record] analysis.

20. In an effort to resolve the VoIP disputes, Level 3 produced a day's worth of data (which the parties agree would be representative of the traffic in question) which purported to identify VoIP Traffic. During September through the first week of October, three to four members of FairPoint's staff devoted time to analyzing Level 3's claimed disputes and new documentation. In addition, FairPoint contracted with a third party, Kansys, to analyze the Call Records provided by Level 3. Kansys determined that the data contained no indication of VoIP Traffic. FairPoint brought this conclusion to Level 3's attention.

21. Level 3 ultimately advised that it would provide VoIP Traffic information but could do so only by inserting that information into existing Call Records. Thereafter, it provided Call Records for a different date than the first set of records with an additional field into which it had imported information. FairPoint submitted this second set of records to Kansys for analysis. Kansys concluded that the records were unreliable for a number of reasons including their alteration and because they identified FairPoint as an originator of certain VoIP Traffic when it does not provide this service. Kansys's review further indicated that only 29% of the VoIP Traffic passed was originated by Level 3 and subject to the rates contained in the URA. The remaining 71% of the VoIP Traffic was originated by third party carriers and was thus ineligible for URA rates. Of the 29% of the traffic which Level 3 originated, Level 3 did not provide any VoIP identifying information.

22. By letter dated August 31, 2011, Level 3 disputed any obligation to provide unaltered Call Records and claimed that it need only provide such records at the time of transmission. It further asserted that it had complied with all terms and conditions of the URA and had in fact overpaid the amounts due to FairPoint. *See* Exhibit G ("When added all up, the monies paid by Level 3 to FairPoint are currently in excess of the monies required to be paid under the [URA] and as such Level 3 is in full compliance with the [URA]."). It disclaimed any need to provide a deposit or Letter of Credit, contending that the parties' dispute was under the Interconnection Agreement not the Tariff. Finally, it asserted that FairPoint was not authorized to declare an embargo.

23. By e-mail dated September 7, 2011, FairPoint provided Level 3 with a breakdown of disputed charges that had been denied, escalated (meaning further investigation would take place), or were resolved in favor of Level 3. The majority of the charges were denied because Level 3 had either failed to provide sufficient information to investigate them or because they represented VoIP Traffic which originated from carriers other than Level 3. Thereafter, Level 3 paid only a small portion of the denied charges.

24. By letter dated October 18, 2011, FairPoint advised Level 3 that the amount due exceeded $6.175 million. It contended that Level 3 was not, and never has been, in compliance with the terms and conditions agreed in the URA and was improperly claiming it was entitled to certain VoIP Traffic rates. It also noted that Level 3 was "short paying" invoices based upon a belief that it was paying in excess of what was owed under the URA. FairPoint again threatened an embargo. It offered to hold off on the embargo if Level 3 paid the disputed amounts into escrow or made a substantial payment of approximately $3.9 million towards the amounts alleged to be due. This amount represented denied VoIP and point of origin charges and allegedly overdue billings.

7

25. After the October 18, 2011 letter, Level 3 offered to continue to discuss the parties' dispute. It was not, however, willing to pay the $3.9 million FairPoint demanded as a condition precedent to further negotiations.

26. As part of the resolution process, Level 3 has paid approximately $120,000 towards the alleged amounts due. It provided a "ball park" estimate that approximately 20% to 40% of the approximately $7.9 million that FairPoint currently claims is due constitute amounts due under FairPoint's Tariff, with the remainder allegedly due under the Interconnection Agreement and state tariffs. Level 3 has not verified the specific charges in question to actually make this determination and did not provide the court with records from which this verification could be made.

27. FairPoint continues to investigate certain disputed charges and has agreed to credit Level 3 $500,000 for a disconnection of service to one of Level 3's customers that was not previously credited. In addition, FairPoint has adjusted certain additional claims (approximately $50,000) in Level 3's favor, including charges it had previously "denied."

28. Level 3 contends that it is standard practice in the industry to continue the resolution process and that the declaration of an embargo is a rare and drastic measure. FairPoint denies that the resolution process is typically continued until the parties reach agreement and asserts that it has declared an embargo with regard to other delinquent accounts.

**The Embargo**

29. To date, pursuant to the embargo, FairPoint has refused to fill approximately twenty two new service orders from Level 3. It is anticipated that it will continue to refuse to fill Level 3's new orders.

30. FairPoint continues to provide services to Level 3's existing customers consisting of approximately one million dollars in services per month. With regard to existing services, Level 3 continues to dispute certain charges and thus the amount in controversy between the parties is growing notwithstanding the embargo.

31. Level 3 contends that it will suffer irreparable harm if FairPoint is not ordered to fill Level 3's new orders. It is often cost prohibitive and time consuming for Level 3 to extend its own network to end users and the process generally takes at least ninety days and often longer. To "work around" FairPoint's network, Level 3 must either use its own network (which requires capacity studies, landlord approval, and rights of way from state and municipal authorities) or contract with other service providers

to use their services.  In Vermont, other service providers who operate in the same areas as FairPoint are relatively scarce, serve limited geographic areas, have far more limited networks than FairPoint, and often focus on residential business.  In addition, each circuit between Level 3 and its customers presents an additional point of potential failure in service.  Thus far, Level 3 has been able to contract with Global Crossings to provide some "work arounds" and thus far, FairPoint has agreed to fill Global Crossings' orders.

32. Level 3's customers generally expect a high level of service quality and reliability. They do business with Level 3 because it can provide "one-stop shopping" by offering services to a multi-location customer at all of its locations in the United States.  If Level 3 is refused services by FairPoint under the Tariff, it is highly likely that Level 3 will lose existing and potential customers as the services it provides are "mission critical" to these businesses' ability to conduct their own operations.  Level 3 identified three customers in Northern New England which are highly likely to take their business elsewhere if Level 3 cannot provide the connections they need. In addition, Level 3 contends that it will suffer significant harm to its reputation in the business community and loss of good will if its orders are not filled.  Finally, Level 3 contends it is likely to lose valuable employees who will look for employment elsewhere if Level 3 cannot offer them commissions due to a lack of business.

33. One of the customers specifically identified by Level 3 provides service to several news organizations that are covering the 2012 elections including the New Hampshire primary.  Level 3 must purchase circuits from FairPoint to provide this service.  It has not been able to secure another provider.  If FairPoint cannot provide this service in New Hampshire, it will jeopardize Level 3's ability to service these same news organizations for election related events elsewhere in the country.

34. Level 3 has offered to place one million dollars in escrow to secure payment for new charges which it estimates to be in the range of approximately $13,000 per month. FairPoint has rejected this offer.

**Claw Backs**

35. In approximately November of 2010, Level 3 ceased paying certain new invoices in full based upon its contention that FairPoint had previously overbilled it for other services.  Level 3 describes this practice as a "claw back" and contends it is a standard practice in the industry.  In a claw back, a customer does not pay the full amount due under a current invoice based upon a contention that at some time in the past, the customer has overpaid a different invoice.

36. Level 3 has "clawed back" approximately $569,000 for charges imposed in the July 2009 to October 2010 time period, all of which relate to VoIP Traffic. In September 2011, Level 3 first notified FairPoint that it had engaged in claw backs and promised to refrain from this practice as part of the resolution process. Nothing in the billing disputes Level 3 submitted, other than the date of the invoice in question, indicates that a "claw back" is being exercised. Level 3 has provided no documentation to either FairPoint or the court that it has overpaid any amounts in 2009 and 2010.

37. FairPoint's representative testified that he had never previously heard of a "claw back" and that nothing in the Interconnection Agreement or the Tariff would allow Level 3 to refrain from paying amounts currently due based upon a dispute about previous charges.

**The Parties' Financial Circumstances**

38. In its most recent quarterly filing with the FCC, Level 3 reported approximately $461 million in cash on hand. Its market capitalization is approximately $4.25 billion. Level 3 does not dispute that it has the financial capacity to pay the alleged amounts due under protest or place them in escrow. It denies that it has any obligation to do so or to provide FairPoint with the requested Letter of Credit.

39. On January 24, 2011, FairPoint emerged from bankruptcy. As of September 30, 2011, its cash on hand was approximately $9.8 million. Level 3's alleged past due amounts constitute either the highest or among the highest of FairPoint's accounts receivables.

## III.   CONCLUSIONS OF LAW AND ANALYSIS.

### A.   Whether Injunctive Relief is Available.

The parties dispute whether the court has the authority to grant injunctive relief where the gravamen of the lawsuit is a claim of violation of the Telecommunications Act and a Tariff. In *Conboy v. AT&T Corp.*, 241 F.3d 242 (2d Cir. 2001), the court considered a private party's request for injunctive relief against AT&T Corp. pursuant to Section 206 and 207 of the Telecommunications Act for an alleged violation of 47 U.S.C. § 222. At the trial court level, in denying the requested relief, the district court held that "an action under Section 206 and 207 of the Telecommunications Act is limited to liability for damages and therefore cannot be the basis for injunctive relief." *Conboy v.*

*AT&T Corp.*, 84 F. Supp. 2d 492, 502 (S.D.N.Y. 2000). The court also rejected the party's request for injunctive relief under 47 U.S.C. § 401, holding that injunctive relief under Section 401 of the Act is available only upon an application of the United States Attorney General at the request of the FCC. *Id.*

On appeal, the Court of Appeals for the Second Circuit affirmed the trial court's conclusions, holding that "the absence of any provision mentioning a general right to seek private injunctive relief for violations of the Act, clearly indicates that Congress did not intend to permit private parties to seek such relief for a violation of Section 222." *Conboy*, 241 F.3d at 255. As the Second Circuit noted, learned commentators have agreed with this conclusion. *Id.* (quoting F. Huber, Federal Telecommunications Law § 3.14.3 (2d ed. 1999) ("A private party has no right to seek injunctive relief to enforce the 'provisions' of the Communications Act. Section 401(a) reserves that authority to the Commission.").

Although *Conboy* addressed Section 222 of the Telecommunications Act, its rationale for denying injunctive relief remains the applicable law in this case. *Conboy* instructs that unless the Telecommunications Act specifically provides for injunctive relief, a private party alleging a violation of the Act is limited to a claim for damages in federal court. *See Northern Valley Communications, LLC v. Sprint Communications Company Limited Partnership*, 618 F. Supp. 2d 1076, 1083-84 (D.S.D. 2009) (holding that *Conboy* is persuasive and extends to private claims brought under Section 207 of the Telecommunications Act as a private cause of action for violations of the Act does not originate from specific provisions but is found in 47 U.S.C. §§ 206 and 207 which do not provide for injunctive relief in federal court).

Here, as Level 3 points out, it has not sought to enjoin a violation of the Telecommunications Act, rather, it has only sought to enjoin an alleged violation of FairPoint's Tariff. Federal courts are empowered to issue injunctions to enforce the terms of a federal tariff and in doing so, do not "enmesh the court in the rate-making process nor undermine the regulatory authority of the FCC." *Marcus v. AT&T Corp.*, 138

11

F.3d 46, 62 (2d Cir. 1998); *see also McLeodUSA Telecommunications Services, Inc. v. Qwest Corp.*, 361 F. Supp. 2d 912, 925 (N.D. Iowa 2005) (granting temporary restraining order enjoining incumbent local carrier from terminating or threatening to terminate tariffed services or requiring security as a condition precedent to the provision of services); *California Independent System Operator Corp. v. Reliant Energy Services, Inc.*, 181 F. Supp. 2d 1111, 1128 (E.D. Cal. 2001) (granting preliminary injunction requiring generator to comply with emergency dispatch instruction provisions of its tariff).   Accordingly, provided the requested injunctive relief is limited to enforcement of the Tariff, the court concludes that Level 3 has established that injunctive relief is available.

### B.   Standard of Review for Injunctive Relief.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008).  In *Winter*, the Supreme Court articulated the applicable standard for granting such relief:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Id.* at 20 (citations omitted).

The Second Circuit requires a party seeking a temporary restraining order (with notice and an opportunity to be heard) or a preliminary injunction to show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). Recently, the Second Circuit ruled that the "serious questions" standard remains viable after *Winter*. *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010).

"The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.* at 35. "Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, the overall burden is no lighter." *Id.* (internal citations omitted).

Where a party seeks an injunction that is mandatory in nature in that it "command[s] some positive act" as opposed to a "prohibitory injunction" that merely maintains the status quo, a more rigorous standard is applied and a preliminary injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested or where extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Mkts.*, 598 F.3d at 35 n.4 (citations omitted).

In this case, Level 3 seeks an order requiring FairPoint to provide new services to Level 3 in accordance with the terms and conditions of the Tariff. The requested injunction would thus maintain the status quo under the Tariff (which requires FairPoint to provide services on a non-discriminatory basis), but it would also clearly require FairPoint to perform an affirmative act. It would also provide Level 3 with substantially all of the relief that it seeks in its Complaint, even though FairPoint could recover for any new services provided as a result of the injunction through a damages award at trial. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (request for injunctive relief must meet "a higher standard" when "an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.").

In this case, because the requested injunction would primarily have the effect of prospectively requiring FairPoint to do business with Level 3, the requested injunction appears to be more mandatory than prohibitive in nature. On the other hand, the court could frame its injunction as prohibiting FairPoint from exercising an embargo, and

thereby arguably render it more prohibitory in nature.  As the Second Circuit has noted, "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics."  *Id.* at 34.  "Determining whether the status quo is to be maintained or upset has led to distinctions that are 'more semantic[] than substantive.'" *Id.* (citation omitted); *see also International Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 835 (1994) (noting that "in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms.").

"The bottom line is that, if a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits of trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief.  Otherwise, there is no reason to impose a higher standard."  *Tom Doherty Assocs., Inc.*, 60 F.3d at 35.  Adopting this bottom line, the court concludes that because FairPoint may recover at trial for services rendered to Level 3 pursuant to the requested injunction, Level 3 should not be required to satisfy a heightened standard of proof in order to obtain injunctive relief.

### C.   Whether Level 3 is Entitled to Injunctive Relief.

#### 1.   *Irreparable Harm.*

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959).  A showing that irreparable harm is "actual and imminent" and "cannot be remedied by an award of money damages" is thus "the single most important prerequisite for the issuance of a preliminary injunction."  *Rodriquez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999).  Indeed, "a showing of irreparable harm is fundamental to any grant of injunctive relief," *Citigroup Global Mkts.*, 598 F.3d at 37 n.6, and in the absence of such a showing, preliminary injunctive relief should be denied.  *Id.*

The instant case presents a close question as to whether Level 3 has satisfied its burden to demonstrate that it will suffer irreparable harm if the requested injunctive relief

14

is denied.  Level 3 persuasively identifies a number of imminent and actual harms that it will suffer if FairPoint continues to refuse to fill its new orders including the almost certain loss of three identified customers.  *See Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444-45 (2d Cir. 1977).  It has also demonstrated that its inability to require FairPoint to fill new orders will cause it to lose potential and existing customers, injure its good will and ability to compete, and inflict substantial harm to its business reputation. *See Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990) ("[I]n cases where a preliminary injunction has issued to prevent a product source from suspending delivery to a distributor, the irreparable harm has often consisted of the loss of customers and the competitive disadvantage that resulted from a distributor's inability to supply its customers with the terminated product").  Level 3 has further demonstrated that the loss of new business is not one that can be timely and effectively addressed through "work arounds" or easily compensated through an award of monetary damages.  *See Tom Doherty Assocs.*, 60 F.3d at 38 ("irreparable harm" may be found when an imminent loss "will be very difficult to quantify at trial.").  Finally, Level 3 has established that in the absence of FairPoint's provision of new services, both Level 3's new and existing customers will be without essential telecommunications services that are "mission critical" to their operations.

Notwithstanding its strong showing of actual, imminent, and serious harm, Level 3 has not demonstrated that such harm is irreparable.  To the contrary, Level 3 has had and continues to have a number of remedies available to it that would allow it to obtain a discontinuance of the embargo without relinquishing its right to challenge validly disputed amounts.  For example, it could have provided the Letter of Credit FairPoint demanded as a deposit, it could have placed the disputed amounts in escrow, or it could have paid the denied charges under protest without waiving any of its substantive rights. Because Level 3 clearly appears to have the financial means to pay the disputed amounts under protest, FairPoint argues that it has engaged in unauthorized self-help.  As one court has observed:

> The clear line of authority regarding rate disputes is that the customer may not resort to self-help; that is, the customer may not merely refuse payment of the disputed rate but must pay the rate and then bring an action to determine the validity of the carrier's actions. In essence, the [customer] resorted to self-help by refusing to pay the disputed deposit and incurring the alleged lost profits[.]"

*Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 2001 WL 99856, at *6 (S.D.N.Y. Feb. 5, 2001); *see also Snecma v. Turbine Engine Components Technologies Corp.*, 531 F. Supp. 2d 354, 358 (N.D.N.Y. 2008) (finding claimant could "avoid the alleged irreparable harm--loss of credibility and good will--by paying the higher price, and then recover monetary damages on the merits in the proper forum[.]"); *but see Verizon Petition for Emergency Declaratory and Other Relief*, 17 F.C.C.R. 26884, 2687 ¶ 29 (2002) (opining that "excluding disputed amounts from any amount considered to be in arrears" is "consistent with current . . . practice and prevents customers from being forced to pay disputed amounts to avoid service disruptions."). Here, it is beyond dispute that Level 3 could avoid imminent and actual harm by paying the disputed amounts under protest.

Level 3 nonetheless contends that in determining whether there is irreparable harm, the court must factor in FairPoint's legal obligation to provide new services under a Tariff which prohibits an embargo for unpaid charges submitted as part of a "good faith dispute." Level 3 contends that all the unpaid charges were submitted as "good faith disputes" and, in such circumstances, FairPoint has no right to declare an embargo or require the provision of "excessive" financial security. It argues that "[t]aking into account all of the[] factors admitted by FairPoint [which might affect the amount due under the Tariff][,] [i]t is clear that the amount that FairPoint might legitimately demand as a condition of lifting the embargo is capped at approximately $2,000,000 and may be significantly less." (Doc. 33 at 22.)[1]

---

[1] Level 3 does not explain why it has not paid this amount.

16

There is some merit to a claim that it would be unjust to require a party, who is entitled to withhold payment for charges that are the subject of a good faith dispute, to simply pay those charges anyway in order to continue services, especially if that same ransom could be unfairly demanded again in the future. *See Snecma*, 531 F. Supp. 2d at 358. In other words, if FairPoint's declaration of the Embargo was wholly unauthorized, this court should hesitate to deny injunctive relief simply because Level 3 has the financial capacity to pay amounts it does not owe in order to avoid an Embargo that it should not face. In light of this argument, the court postpones its determination of whether Level 3 has established irreparable harm until it has considered whether Level 3 is likely to prevail on the merits or has demonstrated "serious questions" going to the merits.

### 2. *Likelihood of Success on the Merits or Serious Questions.*

#### a. The Tariff

"[F]ederal tariffs are the law, not mere contracts." *Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998) (citations and quotations omitted). FairPoint must therefore provide services in accordance with its Tariff, and any refusal to do so must be specifically authorized by the Tariff itself.

Under the Tariff, upon proper notice,[2] FairPoint may cease providing existing and new services to a customer that has failed to pay for services previously rendered when

---

[2]Level 3 asserts that it received defective notice of the embargo because the May 11, 2011 written notice FairPoint provided to it referenced the wrong subsection of Section 2.1.8 of the Tariff. *See* Complaint ¶ 22 (alleging an error in referencing Section 2.1.8(C) when the reference should have been to Section 2.1.8(A)). Level 3 alleges it suffered no confusion as a result of this error and the court finds it has not established that FairPoint's notice of the embargo was either materially defective or prejudicial. Because the court agrees with Level 3 that an embargo was not authorized for charges which were initially submitted in good faith but were thereafter denied, the court does not address Level 3's further argument that FairPoint's October 18, 2011 demand letter did not provide the requisite thirty days' notice of the embargo for charges that were "resolved" but unpaid.

due.[3]  However, the Tariff prohibits FairPoint from refusing to provide services with regard to unpaid charges that are the subject of a "good faith dispute." *See* Tariff 2.1.8(F) (embargo provisions do not apply to "charges that a customer does not pay based on submission of a good faith dispute pursuant to 2.4.1(B)(3) [of the Tariff]." ).

Subsection 2.4.1(B)(3)(c) of the Tariff defines a "good faith dispute" in relevant part as follows:

> A good faith dispute requires the customer to provide a written claim to the Telephone Company . . . Such claim must identify in detail the basis for the dispute, and if the customer withholds disputed amounts, it must identify the account number under which the bill has been rendered, the date of the bill and the specific items on the bill being disputed, to permit the Telephone Company to investigate the merits of the dispute.

In this case, Level 3 contends that all of the charges in question were submitted as part of a "good faith dispute."[4]  It further argues that the Tariff is ambiguous as to when, if at all, FairPoint can declare an embargo with regard to charges which were, but are no longer, the subject of a good faith dispute.  As Level 3 correctly points out, any ambiguity in the Tariff must be construed against FairPoint as its drafter.  *See Continental Can Co. v. United States*, 272 F.2d 312, 315 (2d Cir. 1959) ("Ambiguity should be resolved against the carrier where 'the tariff, having been written by the carrier, is vulnerable against the carrier if the tariff's meaning is ambiguous.'") (citation omitted).

---

[3] Both the FCC and the courts generally recognize that a carrier has the right to collect its tariffed charges, even when those charges may be in dispute.  *See Nat'l Commc'ns Ass'n, Inc.*, 2001 WL 99856, at *4-5 (collecting cases).

[4] Level 3 seeks to rely on the definition of "good faith" set forth in BLACK'S LAW DICTIONARY rather than on how the Tariff defines a good faith dispute.  At the same time, it does not dispute that the language of the Tariff is controlling.  *See Am. Tel. & Tel. Co. v. New York City Human Resources Admin.*, 833 F. Supp. 962, 970 (S.D.N.Y. 1993) (tariffs conclusively and exclusively enumerate the rights and liabilities of the parties who provide and receive services pursuant to them).  The court agrees that the Tariff conclusively determines what constitutes "a good faith dispute."

While acknowledging the Tariff is not a "model of clarity" on this issue, FairPoint counters that its embargo was properly declared because Level 3 cannot establish that it submitted a "good faith dispute" in the first instance with regard to each of the charges in question.  Moreover, even if could, FairPoint contends that Level 3 can no longer claim the existence of a good faith dispute with regard to charges that have proceeded through the Tariff's dispute resolution process and been denied.  It argues that those charges alone provide grounds for the embargo and that any other interpretation of the Tariff would be nonsensical.[5]

The court agrees with Level 3 that the Tariff is ambiguous as to when an embargo may be declared with regard to charges that were, but are no longer, the subject of a "good faith dispute."  Accordingly, in order to establish a likelihood of success on the merits or serious questions regarding whether FairPoint imposed an unlawful embargo, Level 3 must only establish that it *submitted* a "good faith dispute" with regard to the unpaid charges for which the embargo was declared.  With regard to this relatively limited burden, Level 3 falters.

> **b.  Whether a "Good Faith Dispute" Has Been Established.**

Other than conclusory statements,[6] Level 3 has provided no evidence from which the court can conclude that each of the disputed charges was submitted with sufficiently detailed information to constitute a "good faith dispute."  The handful of records Level 3 has submitted are merely illustrative of how Level 3 submits a dispute and do not necessarily pertain to the dispute presently before the court.[7]

---

[5] The Tariff imposes financial consequences for disputed charges that are resolved in FairPoint's favor and clearly anticipates that those charges will ultimately be paid.  It is, however, wholly silent as to whether an embargo may be declared if they are not.

[6] *See, e.g.*, Doc. 33 at 9 (Plaintiff's Post-Hearing Brief) ("All of Level 3's disputes were submitted in good faith.  Bruny Decl. ¶ 5."); ("At the time the disputes were submitted by Level 3, they were made in good faith.").

[7] Level 3 acknowledges that the spreadsheets it has attached as exhibits to its declarations do not provide the information needed to support a conclusion that Level 3 has submitted a "good faith dispute."  Although it claims that the records in question are voluminous, it proffered no witness

In contrast, FairPoint has established that many of the charges Level 3 has disputed *were not submitted* with the information required for a "good faith dispute." It has further established that it repeatedly requested additional information from Level 3 that would allow it to investigate and resolve the disputed charges and Level 3 either delayed in its provision of this information, was untruthful regarding its provision, or simply did not provide it.

For example, with regard to the contested VoIP Traffic charges, Level 3 did not provide the information necessary to investigate them when the disputes were submitted. It also did not do so upon request thereafter although it furnished data which should have contained this information. In September of 2011, Level 3 finally submitted records containing VoIP Traffic information into which it had imported information. However, by this time, Level 3 had been disputing VoIP Traffic charges for over nine months. In its post-hearing filing, Level 3 addresses this chronology of events in a footnote and blames its failure to provide the information necessary for a good faith dispute on FairPoint's template:

> FairPoint may also argue that Level 3 failed to provide information to support its VoIP claim that FairPoint asked for. Mr.[] Bruny testified that in September 2011, Level 3 in fact provided all information FairPoint requested to support Level 3's VoIP claim. Mr. Bruny and Mr. Nolting agreed that there was no place on FairPoint's dispute template for Level 3 to provide spreadsheets of information.

(Doc. 33 at 11 n.3) (internal citations omitted).

The VoIP Traffic charges dispute, moreover, was not merely a delay in providing the required information. In reliance upon Level 3's purported good faith, FairPoint contracted with a third party to have the data analyzed only to discover that it contained no evidence of VoIP Traffic. When a second set of call records was submitted with information added by Level 3, it classified certain traffic originating from FairPoint as

---

who had reviewed them and determined that they contained the information FairPoint needed to investigate the disputed charges and resolve them.

VoIP Traffic even though it is undisputed that FairPoint does not provide this service. In addition, the second set of data failed to substantiate Level 3's claim that it has originated VoIP traffic. Level 3 characterizes the dispute as one regarding the proper interpretation of the data and the URA. *See* Doc. 93 at 11-12. A more accurate characterization is that the disputed VoIP charges did not constitute a "good faith dispute" when submitted and did not become one thereafter.

In the absence of a "good faith dispute" with regard to each of the unpaid charges in question, FairPoint was authorized to declare an embargo. Conversely, because Level 3 has not established a good faith dispute with regard to each unpaid charge, it cannot establish a likelihood of success on the merits. *See Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993) ("In the ordinary course, plaintiffs who are unable to convince the trial court that they will probably succeed on the merits will not obtain interim injunctive relief.").

With somewhat greater hesitation, the court finds that Level 3 also does not satisfy the "serious questions" standard. Although Level 3 has claimed through conclusory statements and testimony that it has submitted only "good faith disputes," it has not proffered any evidence to corroborate that claim and FairPoint forcefully disputes it with evidence that supports a contrary conclusion. At best, Level 3 has demonstrated that a small portion of the unpaid charges at issue were resolved in its favor including charges FairPoint previously "denied." This leaves the vast majority of the unpaid charges bereft of an evidentiary basis for deeming them submitted as part of a "good faith dispute." There is thus a significant failure of proof. *See Tuxworth v. Froehlke*, 449 F.2d 763, 764 (1st Cir. 1971) ("No preliminary injunction should be granted in any case unless there appears to be a reasonable possibility of success on the merits . . . we must perceive at least some substantial possibility.").

The "serious questions" standard is generally reserved for cases where evidence has been proffered, but because it is conflicting, doubtful, or not yet established, the court cannot rely upon it but must instead consider the pros and cons of granting or denying

injunctive relief. *See Citigroup Global Mkts., Inc.*, 598 F.3d at 35 ("serious question" standard applies when the court "cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."); *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) (holding "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus more deliberate investigation.") (internal citations omitted).  Here, the proof, if it exists, is solely within Level 3's possession and yet, after many months of negotiations, demands that it be furnished, and opportunities and incentives to do so, Level 3 has failed to provide it to either FairPoint or the court.  Level 3 thus cannot satisfy either the likelihood of success or serious question standard.

In turn, the court finds that Level 3 has failed to show that any harm it will suffer is irreparable and cannot be compensated through an adequate remedy at law.  There are now two lawsuits pending in which Level 3 may recover for any charges that it claims are not due and which it must pay under protest.   In the circumstances of this case, it would not be unjust to require Level 3 to comply with this condition precedent in order to lift the embargo without judicial intervention.  The converse, however, is not true.  To grant preliminary injunctive relief to a party which not only has the ability, but the apparent obligation, to pay the amounts allegedly due under protest would render the requirement of irreparable harm illusory.

### 3.    Balance of Hardships.

Although it need not do so, the court further concludes that Level 3 has not established that the balance of hardships tips decidedly in its favor. *Id.*  Level 3 will inevitably suffer the loss of business, profits, good will and reputation if the embargo continues.  It, however, has the clear financial means to pay the amounts allegedly due under protest and thereby stop the embargo.  Accordingly, "any hardships arising

therefrom would be purely financial and relatively easy for [Level 3] to absorb." *Snecma*, 531 F. Supp. 2d at 359.

In contrast, if FairPoint is ordered to continue to provide services to Level 3 notwithstanding the substantial amounts due, its own financial well-being may be jeopardized as the amount in controversy between the parties is increasing to FairPoint's decided detriment.[8]  Granting injunctive relief where Level 3 may secure the same relief by paying under protest will thus inflict more financial harm on FairPoint than denying it will inflict on Level 3.

### 4.      *Whether Level 3 Acted in Good Faith.*

Finally, as part of its analysis of the availability of injunctive relief, the court must consider whether Level 3 can establish that it has acted in good faith.[9]  "The guiding doctrine in this case is the equitable maxim that 'he would comes into equity must come with clean hands . . . [which] is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness of bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945) (denying injunctive relief when plaintiff's claims of rights to an invention were false).  A claim of "unclean hands" however "is not an automatic or absolute bar to injunctive relief; it is only one of the factors the [c]ourt must consider when deciding whether to exercise its discretion and grant an injunction." *Dunlop-McCullen v. Local 1-S*, 149 F.3d 85, 90 (2d Cir. 1998) (citing 11A Wright, Miller, Kane FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2946, at 111)).

---

[8] As is its right, Level 3 continues to dispute the charges FairPoint provides to Level 3's existing customers.

[9] Good faith is also relevant to the question of the public interest because a party who has not acted in good faith should not be permitted to invoke the public's interest in the provision of telecommunication services in support of granting injunctive relief.  *See DeBuono*, 175 F.3d at 233 ("[W]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests[.]") (citation omitted)).

FairPoint contends that Level 3 has not acted in good faith for a number of reasons. First, Level 3 significantly delayed the provision of information that would have allowed FairPoint to promptly investigate and resolve the charges in question. Second, when Level 3 finally provided the requested information, it was untruthful regarding what it contained, it had altered the data in question, and the data in question was incorrect, insufficient, or did not support the claims Level 3 had made with regard to it. As this delay was coupled with Level 3's nonpayment, refusal to provide security, and refusal to escrow the disputed amounts, FairPoint claims the delay was unwarranted, strategic, and unfairly prejudicial. These claims are not without merit.[10]

More compelling, however, is FairPoint's further claim that in the midst of the parties' lengthy resolution process, Level 3 engaged in an unauthorized self-help method that undermines its repeated claims that it attempted to resolve the disputed charges in good faith. Level 3 concedes that did not pay certain 2010 and 2011 invoices in full based upon an undisclosed belief that it had overpaid invoices for VoIP Traffic in 2009 and 2010. Level 3 neither adequately advised FairPoint that it was exercising this "claw back," nor did it provide any evidence that would allow FairPoint or the court to conclude that previous overpayments had actually occurred. Thus, in the face of a mounting financial dispute between the parties, Level 3 deliberately increased the amount in controversy by failing to pay undisputed charges on current invoices in full. *See* Doc. 33 at 11 ("Level 3's 'claw back' of disputed amounts from previous periods [consisted of ] *withholding payment from undisputed amounts on current invoices*[.]") (emphasis supplied)). A deliberate practice of withholding payment for undisputed charges belies any claim of good faith and undercuts Level 3's repeated assertions that it has paid all undisputed charges in full.

---

[10] FairPoint's claim that Level 3's allegedly duplicative filing of this lawsuit is an independent act of bad faith is considerably less persuasive and would not provide a ground for denying injunctive relief in this case. Level 3 has moved to dismiss the New Hampshire action and FairPoint has not demonstrated that the instant lawsuit is vexatious.

Level 3 attempts to diffuse the impact of its claw backs by contending that the amount of the "claw backs" (which Level 3 concedes was approximately $569,000) was "relatively insignificant," did not all fall within the Tariff, and thus predominately constitute alleged misconduct unrelated to this dispute. *See* Doc. 33 at 27 ("Those amounts cannot factor into a claim of unclean hands because the Second Circuit has held that 'misconduct . . . unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands.'" *A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 18 (2d Cir. 1968) (quotations and citations omitted)). These arguments are unavailing. By exercising "claw backs" in any amount for charges due under the Tariff, Level 3 has failed to demonstrate that it seeks equitable relief with "clean hands." Accordingly, this factor buttresses the conclusion that the "extraordinary" remedy of a preliminary injunctive relief is not warranted in the case at bar.

## IV.    CONCLUSION.

For the foregoing reasons, Level 3's motion for a temporary restraining order and a preliminary injunction (Doc. 2) is hereby DENIED.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this _15th_ day of December, 2011.

_____
Christina Reiss, Chief Judge
United States District Court

25